750 A.2d 126 (2000)
330 N.J. Super. 455
Maria PERREIRA and Luciano Perreira, Plaintiffs-Respondents,
v.
Michael C. REDIGER t/a MCR Horticultural Enterprises and the Preserver Insurance Company, as insurer for Michael C. Rediger t/a Horticultural Enterprises, Defendant,
v.
Oxford Health Plans (NJ), Inc., Defendant-Appellant, and
Columbia Savings Bank and Atlantic Mutual Insurance Company a/k/a Centennial Insurance Company, Defendants-Respondents.
Leonard Achor, Lenore Achor and Preferred Mutual Insurance Company, as insurer for the Achors, Plaintiffs-Respondents,
v.
Oxford Health Plans, Inc., Defendant-Appellant, and
Takako Beninato and Michael Beninato, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted and Argued March 28, 2000.
Decided April 25, 2000.
Scott S. Levinson, for defendant-appellant Oxford Health Plans (NJ), Inc. in A-4281-98T1 and for defendant-appellant Oxford Health Plans, Inc. in A-4621-98T5.
*127 Methfessel & Werbel, Rahway, for respondents Michael C. Rediger t/a MCR Horticultural Enterprises and The Preservers Insurance Company in A-4281-98T1 (Fredric Paul Gallin, Westfield, on the brief).
Smetana & Mahoney, Morristown, for defendants-respondents Columbia Savings Bank and Atlantic Mutual Insurance Company in A-4281-98T1 (John F. Gaffney, on the brief).
Fredric Paul Gallin, Westfield, for plaintiffs-respondents Leonard Achor, Lenore Achor and Proferred Mutual Insurance Company in A-4621-98T5 (Methfessel & Werbel, Rahway, attorneys; Mr. Gallin, on the brief).
Frank P. Beninato, Jr., Elizabeth, for defendants Beninato in A-4621-98T5 (Wm. Nicholas Chango, Jr., on the brief).
Before Judges PRESSLER, KIMMELMAN and ARNOLD.
No. A-4281-98T1 Submitted and No. A-4621-98T5 Argued March 28, 2000.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The novel issue presented by this appeal is whether the collateral source rule, N.J.S.A. 2A:15-97, which prevents a plaintiff from receiving from the tortfeasor a duplication of the medical expenses payments made by his health insurer, is construable as having abrogated the health insurer's common-law right to reimbursement from plaintiff or subrogation against the tortfeasor. As we see the issue, the question is essentially whether the medical costs incurred in the treatment of a plaintiff's injuries that resulted from a tortfeasor's actions should ultimately be borne by the plaintiff's health insurermeaning, of course, its rate-payersor by the tortfeasormeaning, ordinarily, the premium-payers of his liability carrier. We are persuaded that nothing in N.J.S.A. 2A:15-97 precludes the imposition of the ultimate burden on the tortfeasor. We are equally persuaded that to do so is the only fair and equitable result as well as the only result compatible with a tort system predicated on the concept of payment by the wrongdoer and the exoneration of those who are without fault. Accordingly, we reverse the summary judgments dismissing the complaint of defendant Oxford Health Plans, Inc., whereby it sought reimbursement of the medical expenses it paid on behalf of its injured insureds.
There are two cases before us, which we have consolidated for purposes of this opinion. The relevant facts in both are undisputed. In the Achor case, Leonard and Lenore Achor were sued by Takako Beninato, a professional groomer, who was bitten by the Achors' dog while she was grooming it. Her husband, Michael Beninato, asserted a per quod claim. The Achors' homeowners' insurance carrier, Preferred Mutual Insurance Company, provided a defense to the Beninato suit and acknowledged its obligation of indemnity. Mrs. Beninato had sustained serious injuries as the result of the dog bite, and her health insurer, Oxford, paid over $7,000 for her medical expenses. During the pendency of the Beninato action, the Achors and Preferred Mutual filed an action against Oxford (the Oxford action) by verified complaint and order to show cause seeking a declaration that Oxford was barred by the collateral source statute, N.J.S.A. 2A:15-97, from the subrogation or reimbursement remedy it had asserted. That action was consolidated with the pending Beninato negligence action. After the complaint against Oxford was filed, the Beninatos settled their claim with the Achors for $95,000, the release executed by the Beninatos expressly stating that "[t]his release does not include any payment for medical bills and expenses incurred" by them. Thereafter, following an initial ruling in Oxford's favor in the Oxford action, the judge, on a motion for reconsideration, reversed himself, concluding that its reimbursement/subrogation claim was barred by the collateral source statute. Accordingly, he entered *128 judgment in favor of the Achors and Preferred Mutual. Oxford appeals.
The Perreira matter is a slip and fall case. Maria Perreira, whose husband, Luciano Perreira sued per quod, brought this personal injury action against defendant Columbia Savings Bank, on whose premises she fell, and its snow removal contractor. Oxford, Maria Perreira's health insurer, paid some $13,000 for her medical expenses. While that suit was pending, the Perreiras filed an action against Oxford, the negligence defendants, and their liability carriers, The Preserver Insurance Company and Atlantic Mutual Insurance Company, (the Oxford action), seeking a declaration that Oxford was barred by the collateral source statute from either reimbursement or subrogation against the defendants. The two actions were consolidated. The Perreiras' motion for summary judgment in the Oxford action was granted, and Oxford's cross-motion for summary judgment was denied. Shortly thereafter the Perreiras entered into a stipulation of dismissal with the tort defendants but the terms of their settlement have not been disclosed. Oxford appeals.
The collateral source statute, N.J.S.A. 2A:15-97, adopted in 1987, upon which the motion judge relied in summarily dismissing Oxford's complaints in both actions, provides in full as follows:
In any civil action brought for personal injury or death, except actions brought pursuant to the provisions of P.L.1972, c. 70 (C. 39:6A-1 et seq.), if a plaintiff receives or is entitled to receive benefits for the injuries allegedly incurred from any other source other than a joint tortfeasor, the benefits, other than workers' compensation benefits or the proceeds from a life insurance policy, shall be disclosed to the court and the amount thereof which duplicates any benefit contained in the award shall be deducted from any award recovered by the plaintiff, less any premium paid to an insurer directly by the plaintiff or by any member of the plaintiff's family on behalf of the plaintiff for the policy period during which the benefits are payable. Any party to the action shall be permitted to introduce evidence regarding any of the matters described in this act.
With respect to Oxford's claim to a right of reimbursement against its own insured, we note that it had anticipated this eventuality in the policy it issued in both these cases, each of the policies providing as follows in Part X:
If a Member is injured or becomes ill through the act of a third party, Health Plan shall provide care for such injury or sickness. Acceptance of such services will constitute consent to the provisions of this section.
Upon providing care for such injury or sickness pursuant to the terms of this agreement, Health Plan shall be permitted to recover the reasonable value of such care for injury or sickness, when payment is made directly to the Member in third party settlements or satisfied judgments.
The Member shall cooperate fully to assist Health Plan in protecting its legal rights under this Part X.
With respect to Oxford's claim to a right of subrogation against the tortfeasor, it is well settled, in the insurance context, that a right of subrogation may arise either by way of an express agreement between the insured and insurer as set forth in the contract of insurance, by statute, or through the judicial "device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it." Standard Accident Ins. Co. v. Pellecchia, 15 N.J. 162, 171, 104 A.2d 288 (1954). Thus, as Chief Justice Vanderbilt there explained equitable subrogation almost half a century ago:
It is a right of ancient origin, having been imported from the civil law to serve the interests of essential justice between the parties. It is most often *129 brought into play when an insurer who has indemnified an insured for damage or loss is subrogated to any rights that the insured may have against a third party, who is also liable for the damage or loss. In such a case it is only equitable and just that the insurer should be reimbursed for his payment to the insured, because otherwise either the insured would be unjustly enriched by virtue of a recovery from both the insurer and the third party, or in the absence of such double recovery by the insured the third party would go free despite the fact that he has the legal obligation in connection with the loss or damage. Id. at 171, 104 A.2d 288. [Citation omitted.]
Accordingly, therefore, as Chief Justice Vanderbilt concluded,
[s]ubrogation is highly favored in the law, although it is not an absolute right but rather is applied under equitable standards with due regard to the legal and equitable rights of others....

Id. at 171-72, 104 A.2d 288. [Citations omitted.]
See also Culver v. Insurance Co. of N. Am., 115 N.J. 451, 455-456, 559 A.2d 400 (1989); Aetna Ins. Co. v. Gilchrist Brothers, Inc., 85 N.J. 550, 560, 428 A.2d 1254 (1981).
But for N.J.S.A. 2A:15-97, we think there would be little doubt of Oxford's right to be made whole by the tortfeasor who was responsible for the injuries for whose treatment it was required to pay. The question then is whether that statute, whose obvious intent was to preclude plaintiff's double recovery of medical benefits, also intended to enrich the tortfeasor by relieving him of responsibility for this component of the damages he inflicted. We are not only convinced that no such legislative intent can be ascribed to the statute but, moreover, that its silence on the subject of subrogation bespeaks its intention not to alter or affect that well-established common-law right.
In parsing N.J.S.A. 2A:15-97, it is important first to understand both the express and implied limitations on its applicability. First, by its own terms, it does not apply to workers' compensation benefits. That exception is obviously based upon N.J.S.A. 34:15-40, which effectively constitutes the total workers' compensation award as a lien on the worker's recovery in the third-party tort action. The effect of the lien is to avoid both double recovery by the plaintiff and the unjust enrichment of the tortfeasor, the precise result that equitable subrogation is designed to produce. We will have more to say regarding the workers' compensation lien hereafter.
It is also clear, although unexpressed therein, that N.J.S.A. 2A:15-97 does not apply to actions brought under the Tort Claims Act, N.J.S.A. 59:1-1 to 59:12-3. The Tort Claims Act, by virtue of N.J.S.A. 59:9-2e, has contained a collateral source rule since 1972 expressed in virtually the same terms as N.J.S.A. 2A:15-97, for which it clearly provided the model. There is, however, one significant difference between N.J.S.A. 59:9-2e and N.J.S.A. 2A:15-97, and that is that although N.J.S.A. 2A:15-97, the later enacted statute, is silent as to the right of subrogation of the provider of plaintiff's benefits, N.J.S.A. 59:9-2e is not. N.J.S.A. 59:9-2e specifically provides that "[n]o insurer or other person shall be entitled to bring an action under a subrogation provision in an insurance contract against a public entity or public employee." The legislative comment accompanying this section is instructive. After making clear that the collateral-source portion of the provision is designed to prevent a plaintiff's double recovery of benefits, it goes on to explain, with respect to the subrogation bar, that:
Subrogation is prohibited in subparagraph (e) in an effort to limit the exposure to liability of public entities. This provision is consistent with the "no duplicate benefits" approach in the act and reflects a recognition that profit-making insurance companies are in a better position *130 to withstand losses which they contract for than are the already economically burdened public entities. Precedent exists both in statutory law (N.J.S. 2A:48-1, as amended in 1968) and case law (A & B Auto Stores of Jones St., Inc. v. Newark, 59 N.J. 5, 20-28, 279 A.2d 693 (1971)) for the determination to bar subrogation against a public entity by an insurance company. In addition it must be understood that public entities may subject themselves to suit under whatever conditions they consider appropriate, particularly with respect to protecting the public Treasury.
By this comment, the Legislature unequivocally demonstrated both its understanding that abrogation of the common-law right to subrogation requires express legislative action and also its conclusion that where the tortfeasor is a public entity, the public interest in the protection of the public fisc significantly outweighs the health insurance industry's interest in reimbursement from the tortfeasor. Neither of those predicates is applicable to N.J.S.A. 2A:15-97. First, the Legislature, which well knew how to abrogate common-law subrogation when it wanted to, did not do so. Second, a tortfeasor in an action brought under N.J.S.A. 2A:15-97 cannot, by definition, be a public entitythose tortfeasors can only be sued pursuant to the Tort Claims Act.
We also point out that the Legislature was well aware of and specifically addressed the subrogation implications of payment of personal injury protection benefits (PIP), not of course, recoverable at all in an action against the tortfeasor and therefore not requiring a collateral source rule vis-a-vis the tortfeasor in order to avoid plaintiff's receipt of a duplicate recovery.[1]See N.J.S.A. 39:6A-12. And see generally Roig v. Kelsey, 135 N.J. 500, 641 A.2d 248 (1994). With respect to subrogation, the statute, N.J.S.A. 39:6A-9.1, is specific. The provider of PIP benefits may recover its payments to its insured from the tortfeasor only if the tortfeasor, other than a pedestrian, was not required to maintain PIP coverage or was required to and did not. In all other cases involving an insured tortfeasor, the right of subrogation is preserved "by agreement of the involved parties or, upon failing to agree, by arbitration." Thus the Legislature did not purport to abrogate the common-law right of subrogation but only to limit the modality of that recourse by making the judicial forum unavailable and requiring the parties to resort to voluntary agreement or arbitration.
Finally, we have held that the Medicaid lien and reimbursement provisions of N.J.S.A. 30:4D-7.1 are unaffected by N.J.S.A. 2A:15-97. See Lusby v. Hitchner, 273 N.J.Super. 578, 642 A.2d 1055 (App.Div.1994); Marmorino v. Housing Auth. of the City of Newark, 189 N.J.Super. 538, 461 A.2d 171 (Law Div.1983). As we pointed out in Lusby, 273 N.J.Super. at 591, 642 A.2d 1055, overriding the Medicaid lien would serve no statutory purpose since "plaintiff could not in any case pocket a double recovery for medical expenses for the reason that his entire recovery is subject to Medicaid's reimbursement rights." We further noted that no statutory policy would be served by shifting the ultimate payment burden "from the tortfeasor's liability carrier to a governmentally funded secondary payer." We are aware that we said in Lusby, in dictum and in a different context, that an apparent purpose of the collateral source statute was not only preventing plaintiffs' double recovery but also to shift the burden, "at least to some extent," from the liability and casualty industry to the health and disability industry. 273 N.J.Super. at 591, 642 A.2d 1055. That observation was reiterated, also in dictum, by Fayer v. Keene Corp., 311 N.J.Super. 200, 208, 709 A.2d 808 (App. Div.1998). We are, however, satisfied that nothing in the legislative history suggests that any such shift of the ultimate burden of payment, as opposed to the initial burden *131 of payment, was intended by N.J.S.A. 2A:15-97, and we also think it clear that these dicta did not take into account the issue of burden-shifting in the context of the health insurer's subrogation/reimbursement rights.
There is nothing we can perceive in this statute that links prevention of double recovery with abrogation of subrogation and reimbursement rights. Nor is there any logical imperative or public policy concern that necessarily links these concepts. We therefore conclude that while N.J.S.A. 2A:15-97 clearly prevents double recovery, it in no way alters the equitable remedy of subrogation/reimbursement by which one who pays damages caused exclusively by the fault of another is entitled to recoup that payment both to avoid the tortfeasor's unjust enrichment and to advance the interests of fundamental fairness.
Although we have not heretofore addressed the issue of whether the payer's right of subrogation/reimbursement survives the enactment of the collateral source rule, which is itself silent as to those rights, the Federal District Court for the District of New Jersey has held that N.J.S.A. 2A:15-97 is not construable as abrogating, in a Federal Tort Claims Act action brought pursuant to 28 U.S.C.A. §§ 2671-2680, the express contractual reimbursement rights of plaintiff's health plan operated under the Employee Retirement Income Security Act (ERISA), 29 U.S.C.A. §§ 1001-1461. Danowski v. United States, 924 F.Supp. 661, 670-672 (D.N.J.1996). Although the court relied on preemption grounds, it nevertheless noted that enforcement of ERISA's reimbursement rights by the tortfeasor's ultimate payment of the benefits initially paid plaintiff by ERISA could not offend the policy of N.J.S.A. 2A:15-97, since "the threat of double recovery in this situation is illusory." Id. at 672. We further note that at least two jurisdictions that have considered this issue in the context of a collateral source rule substantially similar to N.J.S.A. 2A:15-97 have held, for reasons similar to ours, that the rule does not abrogate the common-law right of subrogation/reimbursement. See Nossoughi v. Federated Department Stores, Inc., 175 Misc.2d 585, 669 N.Y.S.2d 479 (Sup.Ct. 1998); The Travelers v. Boyles, 679 So.2d 1188 (Fla.Dist.Ct.App.1996). See contra Ridge Tool Co. v. Silva, 33 Ohio App. 3d 260, 515 N.E.2d 945 (1986) (denying reimbursement because the health insurer's contract did not expressly provide for reimbursement in the event of the insured's recovery from the tortfeasor).
The question that remains is determination of the most appropriate and expeditious mechanism for affording Oxford its reimbursement/subrogation rights. Where, as here and as expressly authorized by N.J.A.C. 11:4-42.10, the health insurer has a reimbursement provision in its contract with its insured, who is the plaintiff in the tort action, the answer is simple. In the event the action is tried to verdict, N.J.S.A. 2A:15-97 provides that following the return of the verdict, the plaintiff is required to disclose to the court the amount of benefits already received and presumably which were admissible in evidence, and that that sum should then be deducted by the court from the award. In that event, the amount of the deduction is presumptively equal to the amount of the reimbursement to which the plaintiff's health insurer is entitled. At the same time, it is well settled that a legally cognizable right to reimbursement gives rise to an equitable lien on the fund or res from which the reimbursement is required to be made. Temple v. Clinton Trust Company, 1 N.J. 219, 226, 62 A.2d 690 (1948). See also VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 546, 641 A.2d 519 (1994). We are satisfied that the equitable lien in favor of the health insurer created by its reserved right to reimbursement should be dealt with in essentially the same manner as the workers' compensation lien, which also arises from the statutory right of reimbursement. N.J.S.A. 34:15-40(b). This can be done compatibly with N.J.S.A. *132 2A:15-97 by imposing on the tortfeasor the ultimate responsibility to pay the entire award, with the court, at the same time, declaring the amount otherwise deductible under the statute as a lien in favor of the plaintiff's health insurer. We also note that this scheme would permit calculation of plaintiff's attorney's fee on the entire award so that, in effect, plaintiff's attorney's services in creating the fund from which plaintiff's insurer will also benefit will be compensated in the same manner as in a workers' compensation lien. N.J.S.A. 34:15-40(b). Costs of litigation would also be paid out of the total award before division between plaintiff and plaintiff's insurer. It would be, of course, plaintiff's responsibility, as provided for in the insurance contract, to keep the health insurer advised of the litigation developments.
If the tort action is settled before trial, the equitable lien device works just as well. The release would be required to identify the amount of the "prepaid" benefits, and the tortfeasor or, more likely, the tortfeasor's insurer, would make direct payment of those benefits to the plaintiff's health insurer less a pro rata share of counsel fees and costs. In the event the tortfeasor's insurer, the plaintiff, and the plaintiff's health insurer are unable to agree upon the appropriate amounts and deductions, the court will undoubtedly be available to them on motion, and the health insurer permitted to intervene for the sole purpose of asserting its lien to the total fund.
While we need not address the issue of subrogation in the event the health insurance contract has no reimbursement provision since that is not the situation here, we are of the view that the equitable lien device, implemented as we have described, serves the interests of all parties as well as the public policy of N.J.S.A. 2A:15-97.
We are persuaded that the equitable lien device, utilized generally as it is in workers' compensation matters, completely fulfills the no-double-recovery objectives of the collateral source rule; places the ultimate burden on the tortfeasor, where in fairness it belongs; protects the vital and legitimate interests of the health insurance industry;[2] assures plaintiffs the full extent of the "single" recovery to which they are entitled without a reimbursement deduction therefrom; and fairly compensates the attorney whose services have created the fund for plaintiff and the health insurer. Its implementation imposes no onerous burden on the court, expeditiously resolves the financial issues among the interested parties, and leaves the court in as full control as the statute intended.
With respect to the matter before us, it appears that Oxford's reimbursement/equitable lien rights may have been defeated or compromised by the terms of the settlement agreements between the respective tort plaintiffs and defendants and the ensuing releases executed by them. To the extent that may be so, Oxford must be free to pursue its subrogation remedy.
We reverse the summary judgments entered against Oxford Health Plans, Inc., in both cases and remand for further proceedings consistent with this opinion.
NOTES
[1] N.J.S.A. 2A:15-97 expressly excludes PIP claims.
[2] We note that the protection of these interests is the basis of the so-called hospital lien statutes adopted in a number of other states according a lien in favor of medical providers, including health insurers, on the proceeds of a third-party tort recovery. See generally Annotation, Construction, Operation and Effect of Statute Giving Hospital Lien Against Recovery from Tortfeasor Causing Patient's Injuries, 16 A.L.R.5th 262 (1993).